## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Courtney Moore, Derivatively on Behalf of Nominal Defendant VERIZON COMMUNICATIONS INC., | Case no. |
| Plaintiff, | |
| v. | |
| HANS VESTBERG, MATTHEW ELLIS, CLARENCE OTIS, JR., SHELLYE L. ARCHAMBEAU, ROXANNE S. AUSTIN, MARK T. BERTOLINI, VITTORIO COLAO, MELANIE L. HEALEY, LAXMAN NARASIMHAN, DANIEL H. SCHULMAN, RODNEY E. SLATER, CAROL B. TOME, AND GREGORY G. WEAVER,  LOWELL C. MCADAM, RICHARD CARRIÓN, FRANCES KEETH, and KATHRYN TESIJA, | |
| Defendants, | |
| VERIZON COMMUNICATIONS INC., | |
| Nominal Defendant. | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

1.      By and through her undersigned counsel, Plaintiff Courtney Moore ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Verizon Communications Inc. ("Verizon" or the "Company") and against Defendants  Hans Vestberg, Matthew Ellis, Clarence Otis, Jr., Shellye L.

Archambeau, Roxanne S. Austin, Mark T. Bertolini, Vittorio Colao, Melanie L. Healey, Laxman Narasimhan, Daniel H. Schulman, Rodney E. Slater, Carol B. Tome, And Gregory G. Weaver,  Lowell C McAdam, Richard Carrión, Frances Keeth, and Kathryn Tesija (collectively, the "Individual Defendants") for violation of federal securities laws, breaches of the directors and officers fiduciary duties, unjust enrichment, and waste of corporate assets.  Defendant Verizon, along with the Individual Defendants are referred to herein collectively as the "Defendants."

Plaintiff alleges the following against the Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the public documents, transcripts of conference calls and announcements made by Verizon, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, Verizon, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings filed in the securities class actions in the United States District Court District of New Jersey, captioned General Retirement System of the City of Detroit *v. Verizon Communications Inc., et al.,* Case No. 23-cv-05218 (D.N.J) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Verizon Communications Inc. directors and officers from October 30, 2018 until July 26, 2023 (the "Relevant Period").

3.     Verizon Communications Inc. is a holding company that, acting through its subsidiaries is one of the world's leading providers of communications, technology, information and entertainment products and services to consumers, businesses and government entities. With a presence around the world, it offers data, video and voice services and solutions on networks and platforms that are designed to meet customers' demand for mobility, reliable network connectivity, security and control.[1]

4.     In its March 2023 proxy, Verizon told shareholders that:

We believe that we will continue to get more efficient with our capital – using less capital to generate the same amount of revenue for years to come. That will enable us to generate increased cash flow that we can reinvest in our business and return to our shareholders.[2]

2022 was a pivotal year for the growth of Verizon. By successfully rolling out our C-Band spectrum to a majority of the U.S. population and establishing the FWA business as a formidable competitor to traditional wired broadband services, we laid the foundation for Verizon's growth into the future.

5.     This shareholder derivative action stems from Verizon's long-standing decision to bury and leave toxic telephone cables around the country indefinitely to

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/732712/000073271223000012/vz-20221231.htm
[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/732712/000119312523080439/d401667ddef14a.htm

contaminate ground water and pose other potential health risks to the public from exposure to these wires.

6.       From 2018 until 2023, Verizon swept these wires "under the rug" concealing it from nearby residents and the investing public in violation of its disclosure obligations and fiduciary duties.

7.       On or about July 9, 2023, The Wall Street Journal outed Verizon for these buried lead wires when it published an article alerting citizens that their health may be in jeopardy because of these wires.  According to this article, these health risks "include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart, and reproductive problems in adults."[3]

8.       Politicians quickly jumped into the fray with Senator Edward J. Markey writing a letter to Version demanding:

> The telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects," **Senator Markey wrote in his letter to USTelecom.** "This is corporate irresponsibility of the worst kind. […] The members of USTelecom that are responsible for these lead-sheathed cables have a duty — both civic and legal — to ensure that they do not put Americans in harm's way. I will be awaiting answers to my questions, expecting further action and commitments from USTelecom's members, and watching closely from my seats on Senate committees that have jurisdiction over the environmental and public health issues these cables present.[4]

9.       This Wall Street Journal article and Senator Markey's letter were

---

[3] https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b
[4] https://www.markey.senate.gov/news/press-releases/senator-markey-demands-answers-from-telecom-industry-following-reports-of-lead-contamination-from-aging-infrastructure

followed by an Environmental Protection Agency investigation which found "some findings of the pollutant."[5]

10.     Between Verizon's exposure to fines, penalties, remedial work, ongoing testing, government investigations from Senator Edward J. Markey's office or other political offices, the EPA investigation and other agencies, and the Securities Action, Verizon is subject to hundreds of millions of dollars, if not billion, in potential damages.

11.     In fact, Wall Street research firm New Street Research estimated that just for remediation, the total cost to Verizon could be $4.1 billion if all 81,000 miles of lead-copper needed to be replaced with fiber.[6]

12.     The Securities Action seeks to recover substantial damages for violations of securities laws attributable to these buried wires and their nondisclosure for a class of stockholders who purchased Verizon stock between October 30, 2018 and July 26, 2023.

13.     Over this protracted five-year class period covering ongoing federal securities law violations, Verizon filed several 10-Q and 10-K reports with the SEC attesting to the accuracy of the financial statements contained in the 2019 10-K, the

---

[5] https://www.reuters.com/world/us/us-epa-says-no-immediate-lead-health-threats-telecom-cables-2023-09-21/
[6] https://www.fiercetelecom.com/telecom/verizon-latest-disclose-lead-clad-copper-cable-footprint#:~:text=New%20Street%20Research%20estimated%20that%20the%20total%20cost%20of%20remediation,than%20halved%20(%241.7%20billion).

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

14.     These attestations failed to disclose Verizon's exposure to the buried lead cables scandal.

15.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed

16.     As such, a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that a majority of the Company's current directors are personally liable in this derivative action and the Securities Litigation for unexculpated breaches of fiduciary duty and securities laws violations.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to § 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

19.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

20.     Defendant Verizon maintains its Operational Headquarters with executive leadership and corporate functions in this judicial district at One Verizon Way, Basking Ridge, NJ, and the alleged misstatements entered and the subsequent damages took place in this judicial district.

## **PARTIES**

### **Plaintiff**

21.     Plaintiff Courtney Moore is a current shareholder of Verizon common stock and has continuously been a shareholder of Verizon common stock at all

times during the Relevant Period by operation of law.

22.     Plaintiff Courtney Moore is a citizen of Connecticut.

**Nominal Defendant Verizon**

23.     Verizon is a Delaware corporation with its principal executive offices located at 1095 Avenue of the Americas, New York, New York 10036. Verizon's shares trade on The NYSE Capital Market ("NYSE") under the ticker symbol "VZ.

**Hans Vestberg**

24.     Defendant Hans Vestberg ("Vestberg") has served as the Company's Chief Executive Officer ("CEO") since August 2018 and as a member of the Board since June 2018. In addition, Defendant Vestberg has served as the Chairman of the Board since March 2019. For the fiscal years of 2020, 2021, and 2022, Defendant Vestberg received $19,097,582, $20,342,871, and $19,832,750 in total compensation, respectively. Defendant Vestberg is named as a defendant in the Related Securities Action.

**Matthew Ellis**

25.     Defendant Matthew Ellis ("Ellis") served as the Company's Chief Financial Officer ("CFO") from November 1, 2016 through May 1, 2023. For the fiscal years of 2020, 2021, and 2022, Defendant Ellis received $8,826,268, $9,111,889, and $9,379,303 in total compensation, respectively. Defendant Ellis is named as a defendant in the Related Securities Action.

26.     Defendants Vestberg and Ellis are collectively referred to herein as the "Securities Action Defendants."

**Director Clarence Otis, Jr.**

27.     Defendant Clarence Otis, Jr. ("Otis") has been a member of the Company's Board since 2006. Defendant Otis is a member of the Audit Committee, the Finance Committee, and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Otis received $394,000, $370,000, and $370,000 in total compensation, respectively.

**Director Shellye L. Archambeau**

28.     Defendant Shellye L. Archambeau ("Archambeau") has been a member of the Company's Board since 2013. Defendant Archambeau is Chair of the Corporate Governance and Policy Committee and a member of the Audit Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Archambeau received $356,000, $336,000, and $328,000 in total compensation, respectively.

## Director Roxanne S. Austin

29.   Defendant Roxanne S. Austin ("Austin") has been a member of the Company's Board since 2020. Defendant Austin is a member of the Audit Committee and the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Austin received $256,720, $320,000, and $316,000 in total compensation, respectively.

## Director Mark T. Bertolini

30.   Defendant Mark T. Bertolini ("Bertolini") has been a member of the Company's Board since 2015. Defendant Bertolini is Chair of the Finance Committee and a member of the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Bertolini received $354,000, $332,000, and $332,000 in total compensation, respectively.

## Director Vittorio Colao

31.   Defendant Vittorio Colao ("Colao") has been a member of the Company's Board since 2022 and had previously served on the Board from 2019 to 2021. Defendant Colao is a member of the Corporate Governance and Policy Committee and the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Colao received $334,000, $33,250, and $50,000 in total compensation, respectively.

**Director Melanie L. Healey**

32.     Defendant Melanie L. Healey ("Healey") has been a member of the Company's Board since 2011. Defendant Healey is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Healey received $329,000, $308,000, and $302,000 in total compensation, respectively.

**Director Daniel H. Schulman**

33.     Defendant Daniel H. Schulman ("Schulman") has been a member of the Company's Board since 2018. Defendant Schulman is Chair of the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Schulman received $356,000, $336,000, and $334,000 in total compensation, respectively.

**Director Rodney E. Slater**

34.     Defendant Rodney E. Slater ("Slater") has been a member of the Company's Board since 2010. Defendant Slater is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Slater received $328,000, $308,000, and $304,000 in total compensation, respectively.

## Director Gregory G. Weaver

35.     Defendant Gregory G. Weaver ("Weaver") has been a member of the Company's Board since 2015. Defendant Weaver is Chair of Audit Committee and a member of the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Weaver received $374,000, $350,000, and $350,000 in total compensation, respectively.

## Former Director Richard Carrión

36.     Defendant Richard Carrión ("Carrión") served as a member of the Company's board from 1995 until his term expired effective May 2, 2019.

## Former Director Frances Keeth

37.     Defendant M. Frances Keeth ("Keeth") served as a member of the Company's board from 2006 until her term expired effective May 2, 2019.

## Former Director Kathryn Tesija

38.     Defendant Kathryn Tesija ("Tesija") served as a member of the Company's board from 2012 until her term expired effective May 7, 2020.

## Former Director Lowell McAdam

39.     Defendant Lowell McAdam ("McAdam") served as a member of the Company's board from March 4, 2011 until his term expired effective May 2019.

**Former Director Carol B. Tome**

40.     Defendant Carol B. Tome ("Tome") served as a member of the Company's Board from January 1, 2020 until March 12, 2020.  Defendant Tome is a member of the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Tome received $395,400, $102,000, and $306,000 in total compensation, respectively.

41.     Defendants Hans Vesterberg and Matthew Ellis are referred to herein collectively as the "Securities Action Defendants."

42.     Defendants Otis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan, Schulman, Slater, Tome, Weaver, McAdam, Tesija, Keeth and Carrión are collectively referred to herein as the "Director Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers, directors, and/or fiduciaries of Verizon and because of their ability to control the business and corporate affairs of Verizon, the Individual Defendants owed Verizon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Verizon in a fair, just, open, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Verizon and its shareholders so as to benefit all shareholders equally.

44.     Each director and officer of the Company owes to Verizon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Verizon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.     To discharge their duties, the officers and directors of Verizon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Verizon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who

14

were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Verizon's Board at all relevant times.

48.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

49.    To discharge their duties, the officers and directors of Verizon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Verizon were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York,

Delaware, and the United States, and pursuant to Verizon's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Verizon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Verizon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Verizon's operations would comply with all applicable laws and Verizon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

16

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.     Each of the Individual Defendants further owed to Verizon and the shareholders the duty of loyalty requiring that each favor Verizon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

51.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Verizon and were at all times acting within the course and scope of such agency.

52.     Because of their advisory, executive, managerial, and directorial positions with Verizon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

17

53.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verizon.

### **Verizon's Code Of Conduct**

54.     The Individual Defendants, as officers and/or directors of Verizon, were also bound by the Company's Code of Conduct (the "Code")3 which, according to the Code, sets out basic principles to guide the members of the Board of Verizon, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

55.     Regarding conflicts of interests, the Code states that:

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

56.     Regarding personal conflicts of interests, the Code states that:

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise - directly or indirectly - someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

57.     Regarding disclosure and accurate record keeping, the Code states

that:

We are committed to maintaining and providing truthful information that satisfies all legal requirements. We do not tolerate the falsification or improper alteration of records. You must create and maintain true and accurate records. If you identify any mistakes or discrepancies, no matter how small, you must try to resolve them immediately, and you

must promptly notify your supervisor. You may never direct anyone to create or approve a false or misleading record, or intentionally take any action that helps to create a false or misleading record, such as withholding information from someone preparing a record. Company records must be retained according to applicable laws and Verizon's Records Management Policy. You may never destroy, alter, or conceal any record if you have been directed to retain it or if you know - or reasonably believe there is a possibility - of any litigation or any internal or external investigation concerning that record. If you believe a record was intentionally falsified or created to misleading, or if anyone directed you to violate any section of this policy, you must immediately contact Verizon Ethics.

Our investors and shareholders are key to our success and we are committed to transparency in financial reporting. All disclosures made in financial reports and

in public communications must be full, fair, accurate, and understandable. You may not selectively disclose ( even in one-on-one or small meetings) any material information regarding the company. You should be particularly careful not to disclose such information if you make presentations to customers, business providers, investors, or other third parties.

We use auditors to ensure the accuracy of our reporting. You must cooperate with auditors and provide them with complete, accurate, and timely information, and you must never improperly influence or mislead any auditor.

58.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

## <u>Duties Of The Members Of The Audit Committee</u>

59.     Pursuant to the Audit Committee Charter of Verizon, the purpose of

the Audit Committee is to:

> [A]ssist the Board of Directors in its oversight of: (1) the integrity of
> the Corporation's accounting and financial reporting and its systems of
> internal controls, (2) the performance and qualifications of the
> independent registered public accounting firm (including the
> independent registered public accounting firm's independence), (3) the
> performance of the Corporation's internal audit function, and ( 4) the
> Corporation's compliance with legal and regulatory requirements.
> Consistent with this oversight function, the Committee shall have the
> authority to conduct investigations into any matters within the
> Committee's responsibilities and, in doing so, have full access to the
> Corporation's records, employees, and independent registered public
> accounting firm (with or without the presence of management). The
> Committee shall have the authority, to the extent it deems necessary or
> appropriate, to retain, utilize and rely on legal, accounting or other
> advisors for advice and assistance. The Corporation shall pay the costs
> of any such advisors retained by the Committee.

60.     Specifically, the Audit Committee has the following duties, among

others, with respect to the Company's risk management and control:

> 1.  Assess and discuss with management the Corporation's
>     significant business risk exposures (including those related to
>     cybersecurity, data privacy and data security) and
>     management's program to monitor, assess and manage such
>     exposures, including the Corporation's risk assessment and risk
>     management policies.
>
> 2.  Assess the adequacy of the Corporation's overall control
>     environment, including controls in selected areas representing
>     financial reporting, disclosure, compliance, and significant
>     financial or business risk.

3. Review reports from the CEO and CFO on any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls.

4. Assess the annual scope and plans of the independent and internal auditors.

5. Report to the Board of Directors on the activities of the Corporation's Management Audit Committee.

61. The Audit Committee has the following duties, among others, with respect to the Company's financial reporting and disclosure matters:

6. Review and discuss with management and the independent auditor the annual audited financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the opinion of the independent auditor with respect to the financial statements.

7. Review and discuss with management and the independent auditor the quarterly financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the results of the independent auditor's quarterly review of the financial statements.

8. Review and discuss with management and the independent auditor any significant events, transactions, changes in accounting estimates, changes in important accounting principles and their application, any major issues as to the adequacy of internal controls and any special audit steps adopted in light of material control deficiencies. The Committee Chair may represent the entire Committee for this purpose.

9. Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods, as well as off-balance sheet structures, on the financial statements.

10. Review, in conjunction with the Committee's review of the quarterly and annual reports, the process for the CEO and CFO certifications with respect to the financial statements and the Corporation's disclosure and internal controls.

11. Review reports from the CEO and CFO on all significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data.

12. Review and discuss with management the public release of earnings information, as well as financial information and earnings guidance provided to analysts and rating agencies and delegate to the Committee Chair the authority, at the Chair's discretion, to review any such release, information and guidance.

13. Recommend to the Board of Directors whether the annual audited financial statements should be included in the Corporation's annual report on Form 10-K.

62. The Audit Committee has the following duties, among others, with respect to the Company's internal audit oversight:

14. Review reports from the Internal Audit department on the proposed scope of the audit plan and the process to develop the plan, as well as the program for integration of the independent and internal audit efforts.

15. Review reports from the Internal Audit department on the status of significant findings and recommendations and management's responses to such findings and recommendations.

16. Review the charter, reporting relationship, responsibilities, activities, organizational structure, qualifications and resources of the Internal Audit department and assess the department's performance.

63. The Audit Committee has the following duties, among others, with

23

respect to the Company's independent auditor oversight:

17. Based upon a report from the independent auditor at least annually, review (a) the auditor's internal quality-control procedures, (b) any material issues raised by the most recent quality-control review or PCAOB review of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and (c) any steps taken to address any such issues.

18. Ensure that the independent auditor submits, on a periodic basis, a formal written statement delineating all relationships between the independent auditor and the Corporation, consistent with applicable PCAOB requirements for independent auditor communications with audit committees concerning independence; discuss the statement with the independent auditor and evaluate the relationships and services that may affect the auditor's objectivity and independence; and take appropriate action to satisfy itself of the auditor's independence.

19. Ensure that the independent auditor has established a procedure for the rotation, no less frequently than every five years, of the lead ( or coordinating) audit partner and of the audit partner responsible for reviewing the audit.

20. Consider, periodically, the rotation of the independent auditor.

21. Review matters related to the conduct of the annual audit, which are required to be communicated by AICPA Statement of Auditing Standards 61 and other generally accepted auditing standards.

22. Conduct the annual discussion with the independent auditor on the quality and acceptability of the Corporation's accounting principles and all alternative principles that have been discussed with management, the potential impact of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

23. Review the independent auditor's management letter.

24. Review with the independent auditor any audit problems or difficulties

24

and management's response.

25. Preapprove all audit and non-audit services to be provided by, and all fees to be paid to, the independent auditor or devise policies delegating pre-approval authority to one or more members of the Committee.

26. Establish policies for the Corporation's hiring of employees or former employees of the independent auditor who were engaged on the Corporation's account.

27. Review and evaluate the qualifications and performance of the independent auditor and the lead ( or coordinating) audit partner.

64.    The Audit Committee has the following duties, among others, with respect to the Company's ethical, legal and regulatory compliance matters:

28. Assess the design, implementation and effectiveness of the Corporation 's compliance processes and programs, including the Code of Conduct.

29. Review with management, the independent auditor and the General Counsel, as appropriate, any legal, regulatory or compliance matters that may have a material impact on the Corporation's financial statements or compliance policies, including any correspondence with or other action by regulators or governmental agencies.

30. Assess the Corporation's policies and procedures with respect to Executive Officers' expense accounts and perquisites, including their use of corporate assets and the reporting of those items (taking into consideration the results of any review of these areas by the internal auditors).

31. Assess the Committee's procedures for (a) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

32. Review reports and disclosures of significant conflicts of interest and

related person transactions.

33. Lastly, the Audit Committee is required to "evaluate annually the processes, activities and effectiveness of the Committee, including the composition, expertise, and availability of the Committee members."

65.     Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Relevant Period

66.     The Relevant Period begins on October 30, 2018. On that date, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2018 (the "3Q18 Form 10-Q"). Attached to the 3Q18 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Vestberg and Ellis, attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. 15. The 3Q18 Form 10-Q contained the following statements regarding the Company's retirement of its copper cable network and transition to updated infrastructure:

Capital Expenditures and Investments

**We continue to invest in our wireless network, high-speed fiber and**

**other advanced technologies to position ourselves at the center of growth trends for the future**. During the nine months ended September 30, 2018, these investments included $12.0 billion for capital expenditures. See "Cash Flows Used in Investing Activities" for additional information. We believe that our investments aimed at expanding our portfolio of products and services will provide our customers with an efficient, reliable infrastructure for competing in the information economy…

**We are consistently deploying new network architecture and technologies to extend our leadership in both fourth generation (4G) and fifth-generation (5G) wireless networks**. Our Intelligent Edge Network design allows us to realize significant efficiencies by utilizing common infrastructure within the core and providing flexibility at the edge of the network to meet customer requirements. …

**Reserves have been established to cover environmental matters relating to discontinued businesses and past telecommunications activities**. These reserves include funds to address contamination at the site of a former Sylvania facility in Hicksville, NY, which had processed nuclear fuel rods in the 1950s and 1960s. In September 2005, the Army Corps of Engineers (ACE) accepted the site into its Formerly Utilized Sites Remedial Action Program. As a result, the ACE has taken primary responsibility for addressing the contamination at the site. An adjustment to the reserves may be made after a cost allocation is conducted with respect to the past and future expenses of all of the parties. Adjustments to the environmental reserve may also be made based upon the actual conditions found at other sites requiring remediation.

(Emphasis added).

67.    These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

68.    On February 15, 2019, the Company filed with the SEC its 2018

Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

69.     The 2018 Annual Report contained the following statements regarding the Company's copper cable network infrastructure:

> ***To compensate for the shrinking market for traditional copper-based products (such as voice services), we continue to build our Wireline business around a fiber-based network supporting data, video and advanced business services - areas where demand for reliable high- speed connections is growing. We continue to seek ways to increase revenue, further realize operating and capital efficiencies and maximize profitability across the segment. We are reinventing our network architecture around a common fiber platform that will support both our wireless and wireline businesses. We expect our "multi-use fiber" Intelligent Edge Network initiative will create opportunities to generate revenue from fiber-based services in our Wireline business ....***

> Consumer Markets provides residential fixed connectivity solutions, including Internet, TV and voice services. We provide these services over our 100% fiber-optic network under the brand "Fios" and ***over a traditional copper-based network to customers who are not served by Fios.*** In 2018, Consumer Markets revenues were $12.6 billion, representing approximately 42% of Wireline's aggregate revenues .....

> *Voice services.* ***We offer voice services on our fiber and copper networks, providing local, long distance, and calling features ....***

> *Core services.* Core services include core voice and data services, which consist of a comprehensive portfolio of domestic and global

28

solutions utilizing traditional telecommunications technology. Voice services include local exchange, regional, long distance and toll-free calling along with voice messaging services, conferencing and contact center solutions. Core data includes private line and data access networks. Core services also include the provision of customer premises equipment, and installation, maintenance and site services. ***We continue to transition customers out of copper-based legacy voice and data services to fiber services, including IP and Ethernet.***

(Emphasis added).

70.     These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

71.     On February 4, 2020, Verizon issued the following Environmental, Health and Safety Policy (the "EHS Policy"):

# Environmental, Health and Safety Policy

Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareholders, and society.

Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed through our environmental, health and safety (EHS) management system and supporting programs to eliminate hazards and reduce EHS risks.

Verizon will provide the resources needed to meet our corporate commitments, fulfill our compliance obligations, and foster a culture of continual EHS improvement.

Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees participation and consultation to identify concerns and opportunities for improvement.

Verizon will provide our customers with solutions—through our products and services—which help them improve safety performance, reduce environmental impact, and support our nation's transition to a sustainable, low-carbon economy.

All Verizon employees and those who conduct business on behalf of Verizon are responsible for following his policy.  The Environmental, Health and Safety organization is responsible for providing direction and support.
For more information about the scope and organization of Verizon's environmental, health and safety management system, please direct inquiries to askEHS@oneverizon.com.

Issued on 02/04/2020

72.     Certain of the statements in the EHS Policy, such as that "Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond

maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society," were materially false and misleading because, at the time the EHS Policy was issued, Verizon was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

73.    On February 21, 2020, the Company filed with the SEC its 2019 Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

74.    The 2019 Annual Report contained the following statements regarding the Company's copper cable network infrastructure:

> Our wireless services are provided across one of the most extensive wireless networks in the United States (U.S.) under the Verizon brand and through wholesale and other arrangements. ***Our wireless services are provided in nine states in the Mid-Atlantic and Northeastern U.S., as well as Washington D.C., over our 100% fiber-optic network under the Fios brand and over a traditional copper-based network to customers who are not served by Fios.*** In 2019, the Consumer segment's revenues were $91.1 billion, representing approximately 69% of Verizon's consolidated revenues. As of December 31, 2019, Consumer had approximately 95 million

wireless retail connections, 6 million broadband connections and 4 million Fios video connections ....

*Residential Fixed Services.* We provide residential fixed connectivity solutions to customers over our 100% fiber-optic network under the Fios brand, and ***over a traditional copper-based network to customers who are not served by Fios.*** During 2018, we commercially launched fifth-generation (5G) wireless technology for the home (5G Home) on proprietary standards in four U.S. markets and on global standards in a fifth market in 2019.

We offer residential fixed services tailored to the needs of our customers. Depending on those needs at a particular time, our services may include features related to, among other things: Internet access at different speed tiers using fiber-optic, ***copper or wireless technology;*** video services that may feature a variety of channel options, video on demand products, cloud-based services and digital video recording capabilities; over-the-top video services; and voice services.

(Emphasis added).

75.   These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

76.   On February 25, 2021, the Company filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.    The 2020 Annual Report stated the following, m pertinent part, regarding the Company's environmental impact:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. During 2020, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added.)

78.    This statement was materially false and misleading because, at the time it was made, the Company was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by earning "customers', employees', and shareholders' trust."

33

79.    The 2020 Annual Report contained the following statement regarding

worker safety:

> In 2020, Verizon employees across the Company came together in
> new ways in response to the health and humanitarian crisis brought
> on by the novel coronavirus (COVID-19) pandemic. Soon after
> COVID-19 was first identified, Verizon took many broad-ranging
> steps to support our employees and their families so that the
> Company could continue providing our essential services to our
> customers and communities. Some of these measures included
> temporarily moving over 115,000 of our employees to remote work
> arrangements and temporarily closing nearly 70% of our Company-
> owned retail store locations or moving to appointment-only store
> access; limiting our customer-focused field operations for a period of
> time; ***enhancing safety protocols for employees working outside
> their homes;*** launching a COVID-19 leave of absence policy and
> expanded family care assistance for employees; and providing
> additional compensation to employees in front line roles that could
> not be done from home for a period of time. In an effort to foster
> transparency and provide support during this unprecedented time,
> Verizon launched a daily live webcast with current information on
> the Company's actions to address the impacts of COVID-19 as well
> as a number of broad ranging resources for employees. In addition,
> Verizon re-trained over 20,000 frontline employees to temporarily
> serve in other roles, such as customer service or telesales, which not
> only promoted the health and safety of our employees, but also
> provided opportunities for learning and career development.

 (Emphasis added).

80.    This statement was materially false and misleading because the

Company did not adequately warn or care for employees who were exposed to

dangerous levels of toxic lead as a result of handling Company-owned cables that

were covered in lead.

81.    On April 27, 2021, July 28, 2021, and October 26, 2021 the Company

filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2021, June 30, 2021, and September 30, 2021, respectively (collectively, the "2021 Quarterly Reports"). Attached to each of the 2021 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

82.     Each of the 2021 Quarterly Reports contained the following statement, which was also included in the 2020 Annual Report:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. In 2021, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added.)

83.     This statement was materially false and misleading for the reasons

discussed in paragraph 83.

84.    On February 11, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud

85.    The 2021 Annual Report contained the following statement:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. During 2021, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added).

86.    This statement was materially false and misleading for the reasons

discussed in paragraph 83.

87.    On April 27, 2022, July 28, 2022, and October 25, 2022 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively (collectively, the "2022 Quarterly Reports"). Attached to each of the 2022 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

88.    Each of the 2022 Quarterly Reports contained the following statement:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that 2022 is a peak year of capital investment for us as we are rapidly deploying C-Band spectrum, which, together with our industry leading millimeter wave deployment, 4G LTE network, fiber infrastructure and other network deployments, will drive innovative products and services and fuel our growth.

(Emphasis added).

89.     This statement was materially false and misleading for the reasons discussed in paragraph 83.

90.     In 2022, the Company posted on its website its 2021 Environmental, Social and Governance Report for the 2021 calendar year (the "2021 ESG Report"). The 2021 ESG Report contained the following statement regarding the Company's handling of waste:

> Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 or e- Stewards. ***Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the***
> ***U.S. or Canada and to require vendors to provide certificates of recycling for the batteries.*** We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.

 (Emphasis added).

91.     This statement was false and misleading at the time it was made because Verizon had failed to properly dispose of its legacy cable infrastructure and was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

92.     On February 10, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual

Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

93.     The 2022 Annual Report contained the following statement regarding litigation risk:

> **We are subject to a substantial amount of litigation, which could require us to pay significant damages or settlements.**
>
> We are subject to a substantial amount of litigation and claims in arbitration, including, but not limited to, shareholder derivative suits, patent infringement lawsuits, wage and hour class actions, contract and commercial claims, ***personal injury claims, property claims, environmental claims,*** and lawsuits relating to our advertising, sales, billing and collection practices. ***In addition, our wireless business also faces personal injury and wrongful death lawsuits relating to alleged health effects of wireless phones or radio frequency transmitters.*** We may incur significant expenses in defending these lawsuits. In addition, we may be required to pay significant awards or settlements.

(Emphasis added).

94.     This statement was false and misleading because it omitted that Verizon also faced a heightened risk of personal injury lawsuits stemming from harm caused by its toxic lead-covered cables, which could also lead to environmental-related litigation (such as if the toxic lead seeps into a source of drinking water).

95.     The 2022 Annual Report further contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we focused on maintaining our network leadership, including by rapidly deploying C-Band spectrum; retaining and growing our high-quality customer base while balancing profitability in challenging market conditions; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. 2022 was a peak year of capital investment for us as we rapidly deployed C-Band spectrum. We believe that this spectrum, together with our industry leading millimeter wave spectrum holding, 4G LTE network and fiber infrastructure, will drive innovative products and services and fuel our growth.

 (Emphasis added).

96.    This statement was materially false and misleading because, at the time it was made, the Company was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public. Further, the Company's ownership of these cables and failure to disclose their ownership of them to employees and others likely to be harmed by them constituted a threat to the Company's reputation and ability to, as it itself stated, create business value by earning the trust of stakeholders.

97.     In 2023, Verizon released on its website its Environmental, Social and Governance Report for the 2022 calendar year (the "2022 ESG Report"). The 2022 ESG Report contained the following statement regarding Verizon's purported efforts to reduce waste, and on responsibly disposing of potentially hazardous waste, such as lead-acid batteries:

**E-waste: reducing, reusing and recycling**

Verizon defines electronic waste, ore-waste, as electronic products and component parts that are at the end of their useful life and/or have been returned by customers. E-waste generated by our business operations includes cell phones, chargers, set-top boxes, network equipment, batteries and associated plastic components. ***In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including***
***1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries.***

We strive to divert 100% of e-waste from landfills by reusing or responsibly recycling materials. To the extent practicable, we reuse electronic products and parts internally. When internal reuse is not possible, we market these materials for reuse through approved vendors or work with partners to responsibly recycle them. Verizon's Circular Supply Chain team partners with Corporate Sourcing to incorporate terms into our vendor contracts for the responsible end-of-life management of our products.

Verizon's device trade-in program supports our efforts to repurpose, reuse or recycle all of the devices and accessories that we receive back from consumers. The program lets both Verizon and non-Verizon consumers return qualifying, pre-owned mobile and other electronic devices in exchange for a Verizon credit or gift card. Consumers can also return obsolete devices for recycling. In addition, we refurbish and redistribute to customers our home internet devices for 4G and 5G fixed wireless access and Fios service.

Many of Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 and e-Stewards. ***Our practice is to require lead- acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require our vendors to provide certificates of recycling for the batteries. We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.***

(Emphasis added).

98.     This statement was false and misleading at the time it was made because Verizon was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

99.     On April 27, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

100.    The 1Q23 Report contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2023, we are focused on maintaining the reliability and resilience of our network, retaining and growing our high-quality customer base while balancing profitability in challenging market conditions, and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our***

> ***stakeholders, limiting our environmental impact and supporting
> our customer base growth while creating social benefit through our
> products and services.*** Our strategy requires significant capital
> investments primarily to acquire wireless spectrum, put the spectrum
> into service, provide additional capacity for growth in our networks,
> invest in the fiber that supports our businesses, evolve and maintain
> our networks and develop and maintain significant advanced
> information technology systems and data system capabilities. We
> believe that our C-Band spectrum, together with our industry leading
> millimeter wave spectrum holding, fourth-generation (4G) Long-
> Term Evolution (LTE) network and fiber infrastructure, will drive
> innovative products and services and fuel our growth.

 (Emphasis added).

101.  This statement was materially false and misleading for the reasons

discussed in paragraph 83.

102.  The statements contained in 71-105 were materially false and

misleading because they misrepresented and failed to disclose the following

adverse facts pertaining to the Company's business, operations, and prospects,

which were known to Defendants or recklessly disregarded by them. Specifically,

Defendants made false and misleading statements and failed to disclose that: (1)

Verizon was responsible for cables around the country that are highly toxic due to

their being wrapped in lead, a known neurotoxin, which has harmed and posed the

risk of further harming the environment, exposed Company employees, and the

general public; (2) Verizon faces potentially significant litigation risk, regulatory

risk, and reputational harm as a result of its responsibility for these lead-covered

cables and the health risks stemming from their presence around the United States;

(3) Verizon was warned about the damage and risks presented by these cables but did not disclose them as a potential threat to employee safety or to everyday people and communities; and (4) as a result, Defendants' statements about Verizon's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis in fact at all relevant times.

## WALL STREET JOURNAL ARTICLE

103.   On Sunday, July 9, 2023, *The Wall Street Journal* released an article entitled "America is wrapped in miles of toxic lead cables." It stated, in pertinent part:

> [... ] Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.

> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.

> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination - more than 2,000 lead-covered cables - that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.

Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.

For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.

Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

***In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable.***

In response to the Journal's reporting, [... ] Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety

guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for US Telecom, a broadband association that represents companies in the industry.

\*    \*    \*

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

## AMONG THE FINDINGS

*-Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area,"*

designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

-Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

-In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben **Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. "This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up.**"

## AN ANCIENT NETWORK

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modem carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable

locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. ***Removing Army Corps- approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount.***

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request-a process that included diving expeditions at some locations.  They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet-a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood- more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, usmg a certified environmental testing lab.

*     *     *

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil. At the comer of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child,

said Caravanos. "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School. The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas. Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

## FINGERPRINTING LEAD

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved. The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables-as opposed to, say, lead from a factory or from paint.

*     *     *

At some cable sites, telecom companies disavowed ownership. In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer. The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion. A water sample taken at the surface in that spot showed lead at 38.8 parts per billion. An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows. Verizon, Frontier Communications and Ziply Fiber, telecom companies that have variously served this region over the years, say they don't own the cables.

## COAL COUNTRY RISK

*In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year.*

*BPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.*

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6- year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. *An analysis of soil collected by the Journal from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA.*

*A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one child's blood higher than 3.5 micrograms per deciliter.* The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.

It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.

51

*Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members discussed their concerns in the tiny borough hall at the edge of the Monongahela River.*

*"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.*
*"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens." "*

104.    The Board's failure to implement processes to oversee the Company's response to these issues since 2010, like the Board's failure to require a study, failure to make the issue a recurring board agenda item, failure to create a dedicated internal committee, or failure to assign management to address these issues, has exposed the Company to a material risk of substantially higher costs to remediate, increased government intervention and regulation, more negative media attention, and a risk that cables will have to be taken off line if federal, state, and local governments' mandate immediate remediation.

105.    On July 12, 2023, *The Wall Street Journal* released a follow-up article entitled "What AT&T and Verizon knew about toxic lead cables." The article stated, in pertinent part:

> [... ]For decades, [Verizon and other firms] dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.

They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. [. . .] Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

*     *     *

***Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.***

*     *     *

"They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead. Many more are likely to exist.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. Roughly 80% of sediment samples taken next to underwater cables showed elevated levels of lead.

Doctors say that no amount of lead is safe, whether ingested or

inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks. USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

The group declined to provide or describe any such studies and literature.

*       *       *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modem carriers AT&T and Verizon.

Some lead experts say the cables should be removed, and any contaminated soil should be taken to an appropriate landfill. Removing a lead-sheathed cable could release lead into the environment during the process but some experts say leaving the lead could result in decades-long contamination.

Other experts say less-drastic measures could decrease the risk of contamination, such as covering areas where the cables are exposed. Removing underwater cables would be a far more complicated and

costly process that could require an assessment of the risk of disturbing the lead.

Telecommunications companies have wrestled with how to handle the cables. Malone's 2010 presentation noted that removing the cables that were underground wasn't easy. "Extraction of cable from underground duct can release unexpected high levels of lead dust," the presentation said. "Underground cable presents real possibilities for overexposure" to workers removing them.

The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith. Cables from the 1920s could be nearly impossible to pull out, he said. "In the underground, unless you really needed the conduit duct... you would leave it in place," he said.

\*     \*     \*

The question of who might be responsible for any cleanup is complicated, said Brian Berkey, an associate professor of legal studies and business ethics at the University of Pennsylvania's Wharton School. When the cables were installed, if they were a reasonable and responsible decision, and considered safe at the time, the cleanup could ethically be a collective responsibility involving companies and the government, he said.

## LEAD ROOTS

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modem industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925

book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers-cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell

Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead- based solder has remained in use.

## SMELTING HEADACHES

\*     \*     \*

*Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union. That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.*

*Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."*

"When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.

"For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said. The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.

"Verizon's long standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said.

A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator. "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.

Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.

\*       \*       \*

In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

(Emphasis added).

106.   On July 14, 2023, *The Wall Street Journal* released an article entitled

"I Was Really Sick, and I Didn't Know From What." The article stated, in pertinent

part:

Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure. There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables, many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.

[... ] Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.

Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. [... ]
*A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.*

107.   AT&T and Verizon declined to comment on the studies.

*Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests.* The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the Association of BellTel Retirees, which advocates for former workers.

108.   The article profiled Tom Killeen, a former cable splicer for, among other companies, Verizon. The article stated "Killeen has chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure. Mr. Killeen stated,'/ *was coming home every day and holding the baby, not thinking there is lead dust all over you.'''* (Emphasis added).

109.   The article also profiled Tommy Steed, a former cable splicer and lineman for, among other companies, Verizon. The article stated that "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records. The average level for the U.S. population at the time was 2.8 micrograms per deciliter, according to the Centers for Disease Control and prevention." According to the article, Mr. Steed stated *"[a]t the height of my lead poisoning, I was really sick, and I didn't know from what."* (Emphasis added).

110.   Finally, the article profiled James Innes, a former cable splicer for, among other companies, Verizon. Mr. Innes was reported as having "[d]ecades of gastrointestinal problems," and was quoted as saying *"[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead."* (Emphasis added).

111.   The Board's failure to implement processes to oversee the Company's response to these issues since 2010, like the Board's failure to require a study, failure to make the issue a recurring board agenda item, failure to create a dedicated internal committee, or failure to assign management to address these issues, has exposed the Company to a material risk of substantially higher costs to remediate, increased government intervention and regulation, more negative media attention, and a risk that cables will have to be taken off line if federal, state, and local governments' mandate immediate remediation.

112.   On July 17, 2023, *The Wall Street Journal* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in pertinent part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
>
> "Without EPA intervention, we expect that the risk posed by the

cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.

The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.

The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.

The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the

number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.

Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

113.   Verizon's failure to address these cables, like the Board's failure to

perform a study, failure to create a dedicated internal committee, or failure to assign a department to account for these cables, in 2010 or in an otherwise timely manner resulted in materially higher costs to remediate, more government intervention, more media attention, and a greater loss of goodwill for the Company.

114.    The Board's failure to implement processes to oversee the Company's response to these issues since 2010, like the Board's failure to require a study, failure to make the issue a recurring board agenda item, failure to create a dedicated internal committee, or failure to assign management to address these issues, has exposed the Company to a material risk of substantially higher costs to remediate, increased government intervention and regulation, more negative media attention, and a risk that cables will have to be taken off line if federal, state, and local governments' mandate immediate remediation.

115.    On July 26, 2023, *The Wall Street Journal* released an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with

the inquiry.

The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.

\*       \*       \*

Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."

\*       \*       \*

The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y., all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency

Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

\*     \*     \*

[... ] Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

\*     \*     \*

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead.

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and

take swift action to remediate any problems," Hochul said in a statement

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.
The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

116.    The Board's failure to implement processes to oversee the Company's response to these issues since 2010, like the Board's failure to require a study, failure to make the issue a recurring board agenda item, failure to create a dedicated internal committee, or failure to assign management to address these issues, has exposed the Company to a material risk of substantially higher costs to remediate, increased government intervention and regulation, more negative media attention, and a risk that cables will have to be taken off line if federal, state, and local governments' mandate immediate remediation.

## DEMAND FUTILITY ALLEGATIONS

117.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if set forth fully herein.

118.    Plaintiff has filed this derivative action on behalf of the Company to

address and remedy the injuries incurred and anticipated as a direct consequence of the breaches of fiduciary duties committed by the Individual Defendants.

119.   Verizon is included as a nominal party in this action, with no intention of colluding to confer jurisdiction on this Court that it would not otherwise possess.

120.   Plaintiff, a current shareholder of Verizon throughout the period of the alleged wrongdoing by the Individual Defendants, is committed to adequately and fairly representing the Company's interests in pursuing and enforcing its rights. The plaintiff is represented by counsel competent and experienced in derivative litigation.

121.   Pre-suit demand on the Board of Verizon is futile and, therefore, excused.  Every currently sitting Verizon board member is also a named defendant herein because they served as a board member during the misconduct alleged throughout the Relevant Period.

122.   At the time of filing of this complaint, the twelve-member Board consists of Defendants Vestburg, Otis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan, Schulman, Slater, Tome, and Weaver.

123.   Plaintiffs need only to allege demand futility as to six of the twelve Directors that were on the Board (the "Demand Board") when this complaint was filed, and no board member joined after the Relevant Period started.  At least six

board members joined the board before the Relevant Period started.[7]  The last board member to join was Vittorio Colao effective November 4, 2022.[8]

124.   Every defendant signed at least one 10-K which was false and misleading for the reasons set forth herein.

125.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This scheme renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

126.   As set forth above, each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.'

127.   Upon information and belief, in their capacity as members of the

---

[7] https://www.sec.gov/ix?doc=/Archives/edgar/data/732712/000119312523080439/d401667ddef14a.htm
[8] https://www.verizon.com/about/news/verizon-elects-vittorio-colao-its-board-directors

Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

## Defendant Vestberg

128.   Defendant Vestberg is the Company's CEO and has served in his position as CEO since August 2018. Defendant Vestberg is also a member of the Board.  As CEO under NYSE rules, Vestberg cannot be considered independent.

## Defendants Weaver, Archambeau, Austin, Narasimhan, and Otis

129.   Defendants Weaver, Archambeau, Austin, Narasimhan, and Otis served on the audit committee during the relevant period.

130.   As Audit Committee members, they were specifically entrusted with assisting the Board in overseeing the Company's public disclosures, compliance with the Audit Committee charter, and liable for any violations thereof.

131.   The Company's public filings from 2018 to 2013 concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information.

132.   In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled

70

with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Other Board Members**

133.   Every Director Defendant served on the board during the misconduct alleged herein and every Director Defendant signed a 10-K.

134.   Also, as members of the Board, the Director Defendants were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.

135.   As the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties and no Director Defendant has taken remedial action to redress the conduct alleged herein and therefore demand upon them is futile.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duties

136.   Plaintiff restates and incorporates the preceding allegations as though fully detailed herein.

137.   The Individual Defendants were entrusted with fiduciary responsibilities toward the Company. By virtue of these fiduciary relationships, the Individual Defendants were obligated to uphold the highest standards of good faith, equitable dealings, loyalty, and due diligence in their actions.

138.   The Individual Defendants violated and breached their fiduciary duties, including duties of care, loyalty, reasonable inquiry, and good faith.

139.   The Individual Defendants persistently and systematically failed in fulfilling their fiduciary obligations. Specifically, they breached duties of loyalty and good faith by allowing inadequate practices and procedures to guide the accurate disclosure of Company information to the investing public and shareholders. This included permitting false and misleading statements in the Company's SEC filings and other disclosures and neglecting to establish sufficient internal controls addressing the substantial reporting deficiencies and issues described herein. Such actions could not be deemed a good-faith exercise of prudent business judgment in safeguarding and advancing the Company's corporate interests.

140.   As a consequence of the misconduct alleged herein, the Individual Defendants bear liability to the Company. The Company has incurred damages, both financial and non-monetary, as a direct and proximate outcome of the Individual Defendants' breach of fiduciary duties. This damage encompasses

expenses related to defending itself in the Securities Class Action, exposure to potential class-wide damages in the Securities Class Action, harm to the share price of the Company's stock resulting in increased capital costs, and tarnished corporate image and goodwill.

141.   Plaintiff, as a shareholder of Verizon and on behalf of Verizon, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

142.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(l), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

144.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time

and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

145.   Under the direction and watch of the Individual Defendants, the 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose to investors that the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by "reducing the environmental impact of our operations.

146.   The Proxy Statements were also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

147.   The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the

matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Company's directors.

148.   The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

149.   Plaintiff on behalf of Verizon has no adequate remedy at law.

<u>**COUNT III**</u>
**Against the Securities Action Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

150.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.   As a result of the conduct and events alleged above, Verizon has been named as a defendant in the Related Securities Action brought on behalf of Verizon shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

152.   Federal law provides Verizon with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau,* 508 U. S. 286, Verizon has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 2 lD(f) of the Securities and Exchange Act further sets forth specific provisions entitling Verizon to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the

currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

153.   Accordingly, Plaintiff, on behalf of Verizon, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Verizon under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Verizon.

154.   Verizon claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## COUNT IV
### Unjust Enrichment

155.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Verizon.

157.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Verizon that was tied to the performance or artificially inflated valuation of Verizon or received compensation that was unjust in light of the Individual

Defendants' bad faith conduct.

158.   Plaintiff, as a shareholder and a representative of Verizon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V
### Waste of Corporate Assets

159.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

161.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

162.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

163.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief and judgment, as follows:

78

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Verizon and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing Verizon to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Verizon and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

1. strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2. strengthening the Company's internal reporting and financial disclosure controls;

3. developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

4. strengthening the Company's internal operational control functions;

D.     Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2023               Respectfully submitted,

**SQUITIERI & FEARON, LLP**

/s/ Lee Squitieri Esq.
Lee Squitieri
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492

**MOORE LAW, PLLC**
Fletcher Moore
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245